| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------ X<br>YESID RIOS SUAREZ,<br>                                  Plaintiff,<br>               -v-<br>UNITED STATES OF AMERICA,<br>                                  Defendant.<br>------------------------------------------------------------ X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: <u>November 27, 2017</u><br><br>17-cv-0133 (KBF)<br>11-cr-0836 (KBF)<br><br><u>OPINION & ORDER</u> |

KATHERINE B. FORREST, District Judge:

On May 2, 2013, Yesid Rios Suarez ("petitioner") was transferred to the United States from Colombia under an extradition agreement; on the same day, he was arraigned for participation in a conspiracy to import cocaine into, among other places, the Southern District of New York. He pled guilty to the Indictment on February 4, 2014. On June 27, 2014, he was sentenced to 648 months of incarceration and fined $1 million under 21 U.S.C. § 963 for conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine.

Petitioner now seeks to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. He contends that his sentence should be vacated because: (1) his plea was neither knowing nor voluntary; (2) he received ineffective assistance of counsel when deciding whether and how to plead guilty; (3) his sentence violates the terms of the extradition agreement; and (4) the United States government's recent reclassification of Fuerzas Armadas Revolucionarias de Colombia ("FARC") warrants resentencing. The main thrust of the petition, read in the light most

favorable to petitioner, is that he believed the Court was bound by the terms of the extradition treaty with regard to sentencing. As such, he claims, he pled guilty only because he believed he would receive a 4.5-year or 12-year sentence.

For the reasons set forth below, the Court DENIES the petition.

I. BACKGROUND

Petitioner, a Colombian citizen, was a leader of a criminal enterprise that included a number of individuals responsible for manufacturing thousands of kilograms of cocaine in laboratories, transporting cocaine to air strips, loading airplanes with cocaine, receiving money from airplanes on return trips or receiving money from trucks, and financiers, and was otherwise extensive. (Mem. Decision & Order, 11-cr-836, ECF No. 52, at 4; see also Fatico Hearing Trs., 11-cr-836, ECF Nos. 53, 55.) The conspiracy was a sophisticated, vertically integrated enterprise that extended over a large territory (including both manufacturing and distribution operations.) (Id. at 4-5.) Petitioner participated in this enterprise beginning in the 1990s and for more than fifteen years, and the enterprise generated millions of dollars in revenue during that time. (Id. at 5.)

Additionally, petitioner caused members of the conspiracy, including individuals guarding the laboratories at which the cocaine was manufactured (which petitioner supervised) to carry weapons. (Id. at 5.) In furtherance of maintaining the secrecy of the operation, petitioner caused men armed with weapons to murder two men. (Id. at 5.) The men were tied up at the order of petitioner and taken to a location at which they were shot and killed. (Id. at 5.) In

2

another instance, he supervised men loading explosives into an airplane to drop on oil pipelines in a terrorist attack. (Id. at 5.) All told, petitioner committed these offenses as part of criminal conduct engaged in as a livelihood; there was no evidence that he engaged in any legitimate occupation during that time.

On September 29, 2011, an Indictment was returned against petitioner charging him with participation in a conspiracy to import cocaine. (11-cr-836, ECF No. 3.) Pursuant to an extradition treaty between the United States and Colombia that, inter alia, prohibited petitioner from being subjected to life imprisonment, (Pet. Ex. B at 6), petitioner was extradited to the United States on May 2, 2013. On the same day, he was arraigned by this Court and pled not guilty to the single count filed against him. He was provided with counsel from the Criminal Justice Act Panel ("CJA counsel"), Aubrey Lees, as well as a Spanish interpreter.[1]

Lees served as petitioner's attorney until January 7, 2014, when she was relieved as counsel of record due to a "complete breakdown in communications" with petitioner, who refused to "follow [her] advice . . . [and] participate in his defense," and who "persist[ed] in arguing with [her] regarding the law and the application of the law." (11-cr-836, ECF No. 24.) On that day, John Meringolo was appointed as new CJA counsel; Meringolo served as petitioner's counsel when he pled guilty, as

---

[1] Throughout his petition, petitioner references his inability to speak English. The Court notes that at every proceeding in this criminal matter, petitioner received the assistance of a court-appointed translator. At various hearings, the Court notified petitioner that "it is very important that [he] understand the entirety of the proceedings today, so if at any point in time [his] equipment malfunctions and [he] cannot hear the translation, let [his] counsel know and [the Court] will fix it immediately." (July 9, 2013 Hearing Tr. at 2:15–19; see also Plea Tr. at 2:8–21; Sentencing Tr. at 2:10–17.)

3

well as through sentencing and appeal. (See, e.g., 11-cr-836, ECF Nos. 48, 57, 64.) Also on that day, petitioner rejected the Government's offer of a plea agreement with a stipulated Guidelines range of 168–210 months. (Jan. 7 Hearing Tr. at 3:13–23; see also 17-cv-133, ECF No. 1 ("Mot."), at 7.)

Almost a month later, on February 4, 2014, petitioner pled "open" to the Indictment; that is to say, petitioner pled guilty without the benefit of a plea agreement. Before petitioner's allocution, however, the Court informed him of the rights he would forfeit if he pled guilty, including the right to a trial. (Plea Tr. at 8:8–25.) As particularly relevant to the instant petition, the Court explained to petitioner that "the Court is required to do its own calculation of [his] offense level prior to sentencing, and . . . it could be the same as that which [the prosecutor] set forth [at the hearing], it could be different, it could be higher or it could be lower." (Id. at 22:5–10.) It further noted that because petitioner was "not proceeding pursuant to an agreement, . . . nobody right now can calculate [his] offense level with any certainty."[2] (Id. at 22:19–22.)

Moreover, the Court specifically informed petitioner that his offense level "carries a possible term of incarceration of life," and that "while the government may not, pursuant to a treaty, seek a life sentence for [him], that does not prevent the Court from imposing a life sentence on [him]." (Plea Hearing Tr. at 23:10–13.) The Court explained that it has the "discretion to determine any sentence that is at

---

[2] There was no Pimentel letter, (id. at 3:19–20), but later, at the sentencing hearing and in its sentencing submission, the Government sought a sentence of more than 360 months, (Sentencing Tr. at 33:8–11; Government's Sentencing Mem., 11-cr-836, ECF No. 60, at 8).

4

least a statutory minimum but at or below life." (Id. at 23:19–22 (emphasis added).)
Each time the Court asked if petitioner understood, he answered in the affirmative.
Specifically, when asked if he understood that "the Court could sentence [him] to
life imprisonment, . . . and [he] could do no worse if [he] went to trial," he
responded, "I understand, your Honor." (Id. at 24:3–7.)

After all this, petitioner allocuted to knowingly fueling planes packed with
cocaine and he pled guilty to conspiracy to import at least five kilograms of cocaine
from Colombia to the Southern District of New York. (Plea Tr. at 26:12–16.) On
June 27, 2014, he was sentenced to 648 months of incarceration. (Sentencing Tr. at
48:10–17.) The Court noted that it was "not pronouncing a life sentence," but rather
a 54-year sentence. (Id. at 48:18–24.) Petitioner appealed, and the Second Circuit
affirmed the District Court's decision. Now, the Court considers petitioner's motion
for relief under § 2255.

II. LEGAL PRINCIPLES

    A. Pro Se Petitions

Pro se litigants are "entitled to a liberal construction of their pleadings,
which should be read 'to raise the strongest arguments that they suggest.'" Green
v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (quoting Graham v. Henderson, 89
F.3d 75, 79 (2d Cir. 1996)). Nevertheless, a Court must dismiss a petition under
§ 2255 without requiring a government response if "it plainly appears from the
motion, any attached exhibits, and the record of prior proceedings that the moving
party is not entitled to relief." Fed. R. Governing Sec. 2255 Proceedings for the

5

U.S.D.C. 4(b); see also id. 5(a) ("The respondent is not required to answer the motion unless a judge so orders.").

B. The Effect of an Extradition Treaty on Sentencing

Petitioner argues the Court violated the extradition treaty in imposing a sentence of 648 months. But when it affirmed petitioner's sentence, the Second Circuit held as a matter of first impression that petitioner "would only have prudential standing to raise the claim that his sentence violated the terms of his extradition if the Government of Colombia first makes an official protest." United States v. Suarez, 791 F.3d 363, 367 (2d Cir. 2015). The Second Circuit relied on precedent that, in general, "absent protest or objection by the offended sovereign, [a defendant] has no standing to raise the violation of international law as an issue." Id. (quoting United States v. Reed, 639 F.2d 896, 902 (2d Cir. 1981)).

In any case, "[t]he rule of specialty, which is derived from principles of international comity, 'generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country.'" United States v. Cuevas, 496 F.3d 256, 262 (2d Cir. 2007) (quoting United States v. Baez, 349 F.3d 90, 92 (2d Cir. 2003) (per curiam)) (emphasis added). As opposed to the prosecutor, "a district court, '[i]n sentencing a defendant extradited to this country in accordance with a diplomatic agreement between the Executive branch and the extraditing nation, . . . delicately must balance its discretionary sentencing decision with the principles of international comity in which the rule of specialty sounds.'"

Cuevas, 496 F.3d at 262 (quoting Baez, 349 F.3d at 93) (alterations in original) (emphasis added).

Furthermore, a sentence for a number of years is not the same as a "life sentence" under an extradition treaty. See Suarez, 791 F.3d at 368 (Kearse, J., concurring) (concurring in the Second Circuit's judgment on petitioner's appeal because the extradition treaty was not violated); United States v. Lopez-Imitalo, 305 Fed. App'x 818, 819 (2d Cir. 2009) ("[Petitioner's] argument that the Government breached the agreement by seeking a sentence of 60 years, which he asserts is the functional equivalent of life imprisonment, fails for the same reason. Had the respective governments intended the Diplomatic Note to be an assurance that the U.S. government would not request a determinate sentence exceeding [petitioner's] expected lifespan, they could have drafted the note to say that.").

C. Knowing and Voluntary Pleas

Petitioner also claims that his plea was neither knowing or voluntary, because he did not understand that the extradition treaty was not binding on the Court. "A defendant may 'seek relief from the underlying plea where the plea was not knowing and voluntary . . . .'" United States v. Alvarado, 581 Fed. App'x 4 (2d Cir. 2014) (quoting United States v. Haynes, 412 F.3d 37, 39 (2d Cir. 2005)). "[I]f [a] defendant asserts that his plea was not voluntary, . . . [he must make] a sufficient showing to raise a significant question as to voluntariness." United States v. Gonzalez, 647 F.3d 41, 53 (2d Cir. 2011). In other words, "a 'defendant's bald statements that simply contradict what he said at his plea allocution are not

7

sufficient grounds to withdraw [his] guilty plea.'" Id. at 56–57 (quoting United States v. Hirsch, 239 F.3d 221, 225 (2d Cir. 2001)) (alteration in original); see also Pringle v. United States, No. 10-cv-9659, 2011 WL 3792820, at *3 (S.D.N.Y. Aug. 25, 2011) ("In the absence of any credible evidence to the contrary, the court is permitted to rely upon the defendant's sworn statements, made in open court, that: his plea was knowing and voluntary . . . .").

    D. Ineffective Assistance of Counsel

Broadly, petitioner further asserts that ineffective assistance of counsel resulted in his being misinformed and, ultimately, his guilty plea. To prevail on an ineffective assistance claim, petitioner "must [first] show that counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688 (1984). In addition, he must demonstrate that counsel's "deficient performance prejudiced the defense," id. at 687, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

As particularly relevant to the instant petition, a defendant's ineligibility for parole is a collateral consequence of a guilty plea. United States v. U.S. Currency in the Amount of $228,536.00, 895 F.2d 908, 915 (2d Cir. 1990); Trujillo v. United States, 377 F.2d 266, 269 (5th Cir. 1967) ("[E]ligibility for parole is not a consequence of a plea of guilty, but a matter of legislative grace. It is equally true

8

that noneligibility for parole is not a consequence of a plea of guilty; rather, it is a consequence of the withholding of legislative grace." (internal quotations omitted)).

"[D]istrict courts need not inform a defendant of collateral consequences during the plea colloquy," United States v. Youngs, 687 F.3d 56, 60 (2d Cir. 2012), and "counsel is not ineffective for failing to advise on collateral consequences," Brooks v. United States, 248 Fed. App'x 77, 82 (11th Cir. 2007); see also Chrisman v. Mullins, 213 F. App'x 683, 687 (10th Cir. 2007) ("[T]he failure to inform of consequences collateral to a plea . . . does not render the plea involuntary, does not implicate the Sixth Amendment, and, therefore, cannot be the grounds for a viable ineffective-assistance-of-counsel claim."); James v. Cain, 56 F.3d 662, 666–67 (5th Cir. 1995) ("[A]s long as the defendant understands the length of time he might possibly receive, he is fully aware of his plea's consequences. A defendant's mere expectation about the commutation and parole process is simply no ground for habeas corpus relief." (internal citations omitted)); Strader v. Garrison, 611 F.2d 61, 65 (4th Cir. 1979) (noting that "parole eligibility dates are collateral consequences of the entry of a guilty plea of which a defendant need not be informed if he does not inquire"); cf. Chrisman v. Mullins, 213 Fed. App'x 683, 687 (10th Cir. 2007) ("Gross misadvice about parole eligibility can render legal assistance ineffective and invalidate a plea.").

9

III. DISCUSSION

    A. <u>Effect of the Extradition Treaty</u>

As noted earlier, the bulk of petitioner's motion is concerned with the Court's and his counsel's response to the extradition treaty. Petitioner contends that, based on what he was told by his lawyer in Colombia and by Meringolo, as well as "what he read for himself in the extradition documents," he believed that the extradition documents were binding on the Court; that is to say, the extradition treaty would ensure a sentence of 4.5 years,[3] or alternatively, of no more than 12 years.[4] He claims that he rejected the plea agreement and pled "open" because of this misunderstanding.

Specifically, petitioner argues: (1) his plea was neither knowing nor voluntary, as he was not informed that the extradition treaty was not binding on the Court; (2) his counsel was ineffective for failing to inform him that the extradition treaty would not limit his sentence; and (3) the 648-month sentence violates the extradition treaty. But during the plea hearing, the Court fully explained that it could sentence petitioner to life, and petitioner said several times

---

[3] Petitioner believes that the treaty required the Court to sentence him as he would be sentenced in Colombia. Petitioner alleges that under Colombian law, he would receive an effective 4.5-year sentence. First, he claims, the sentence that would apply under Colombian law is 8–18 years. (Pet. Ex. A ¶ 10.) He then notes that under Colombian law, "accepting responsibility"—or pleading guilty—"automatically cuts a sentence in half"; thus, he argues, his sentence would have been, at most, nine years. (<u>Id.</u>) Finally, in Colombia, if one works while in prison, he claims, the sentence is cut in half yet again, yielding a maximum of 4.5 years for petitioner, as he saw it. (<u>Id.</u>)

[4] Petitioner also believes that the treaty prohibits a life sentence. Noting that the life expectancy for "a man such as myself in Colombia" is 58 years, and that he was 46 years old at the time of sentencing, he believed that the treaty thus prohibited a sentence of more than 12 years. (Pet. Ex. A. ¶ 11.)

that he understood—any misunderstanding harbored by petitioner was dispelled. The Court addresses each of petitioner's arguments in turn.

  1. Knowing and Voluntary

Petitioner claims that his plea was neither knowing nor voluntary, as he did not understand how the "extradition documents impacted his sentence exposure." (Mot. at 7.)  He claims that the "record of [his] plea hearing lacks any information as to Petitioner's understandings based on . . . what is plainly stated in the extradition documents that any reasonable person would believe limited Petitioner's sentence exposure." (Id. at 8.)  In other words, petitioner argues that he believed the extradition treaty protected him from a sentence of 168–210 months (the range offered by the Government in the plea agreement), let alone 648 months. Had he known that the Court could impose the sentence that it did, he claims, he would not have pled guilty.

But as noted above, at the plea hearing, petitioner was told several times that the Court could sentence him to life imprisonment.  (Sentencing Tr. 23:10–13; id. 23:19–22.)  The Court specifically explained that while the Government could not seek a life sentence pursuant to the treaty, the Court could decide to impose one anyway.  In response to this, petitioner stated multiple times—under oath—that he understood.  The Court cannot simply ignore petitioner's statements in open court, and petitioner has offered no evidence other than "bald statements" to suggest that that his plea was not knowing or voluntary.  Gonzalez, 647 F.3d at 56–57 (quotation omitted).

11

2. Ineffective Assistance

Relatedly, petitioner has not stated a claim under Strickland that his counsel was ineffective for failing to correct the misunderstanding discussed above. This claim builds upon the previous claim; in addition to alleging his own misunderstanding as evidence that his plea was neither knowing nor voluntary, he alleges that it demonstrates ineffective assistance.

More specifically, petitioner claims that, had his counsel properly explained the true impact of the extradition documents, he would not have rejected the plea agreement and pled "open." Petitioner blames his misunderstanding on Meringolo and his Colombian lawyer, as well as on his own reading of the extradition treaty. However, petitioner has not—and cannot—demonstrate prejudice in this regard. The Court itself informed petitioner that it could impose up to a life sentence; had this conflicted with his counsel's advice or his own understanding, he would not have told the Court—under oath—that he understood.

Additionally, at sentencing, the Court noted that even if there had been a plea agreement, it "always retains its own discretion to make a sentencing determination," (Sentencing Tr. at 20:3–4), and that "irrespective of the plea agreement arrived at, it would not have placed the defendant in any position other than that in which he is placed today," (id. at 20:22–24.) "Therefore," the Court continued, petitioner "suffers no prejudice because the Court would have gone through the same analysis today that it is, in fact, going to go through," whether defendant pled with the benefit of a plea agreement or not. (Id. at 20:25–21:6.) As

12

such, petitioner has not demonstrated that he is prejudiced due to his counsel's advice to reject the plea deal.

### 3. Violation of the Extradition Treaty

Finally, petitioner argues that the sentence imposed violates the terms of the extradition treaty. However, as the Second Circuit explained in response to his appeal, petitioner does not have standing to make this challenge. See Suarez, 791 F.3d 363. Only the Colombian government has the right to enforce this agreement in court. And even if petitioner did have standing, or even if Colombia did intervene, the Court is not strictly bound by the treaty in pronouncing a sentence; the treaty only prohibits the Government from seeking a life sentence. In any case, a 648-month sentence is not a "life sentence." See Lopez-Imitalo, 305 Fed. App'x 818.

As such, for no reason does the extradition treaty provide grounds for habeas relief.

### B. Counsel's Failure To Inform Petitioner Regarding Parole Eligibility

Petitioner makes a separate ineffective assistance claim that Meringolo failed to advise him that there is no parole or other early release opportunity in the federal prison system. Had he known this, he again argues, he would not have pled guilty. (Pet. Ex. A ¶¶ 33-35.) But failure to inform a defendant that he may not be eligible for parole does not constitute ineffective assistance. Rather, it is a collateral

effect of a guilty plea, of which counsel need not inform a defendant.[5] Petitioner does not allege that he was misinformed; he claims only that he was unaware that he would not have the possibility of parole. As such, petitioner does not have a claim of ineffective assistance of counsel on this ground either.

  C. Effect of FARC Reclassification

Finally, petitioner argues that the U.S. Government's reclassification of FARC as a "legitimate political party . . . warrants vacatur of [his] sentence and at least a new sentencing hearing" because the Government "relied heavily on [his] claimed role or association with FARC." (Mot. At 17.) But at sentencing, the Court relied on the seriousness of the offense and the consequences of petitioner's drug trafficking—not on his alleged association with FARC. (Sentencing Tr. at 40:2–44:20.) In fact, not once did the Court mention FARC at the hearing.[6] As a result, there is no indication that petitioner's sentence would change based on FARC's

---

[5] In Padilla v. Kentucky, 559 U.S. 356 (2011), the Supreme Court did note that is has never "applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under Strickland." 559 U.S. at 365. However, the Court there distinguished deportation, a "particularly severe penalty," from true collateral consequences. Id. at 366 (2010) ("Deportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence. The collateral versus direct distinction is thus ill suited to evaluating a Strickland claim concerning the specific risk of deportation. We conclude that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel."); see also Youngs, 687 F.3d at 62 ("Padilla's holding was limited to the requirement of counsel to advise of deportation pursuant to their Sixth Amendment responsibilities."). The possibility of parole, conversely, is a collateral consequence; failure to inform a defendant of this consequence is not ineffective assistance of counsel.

[6] In all events, the Executive Branch's reclassification of a foreign political party years after a particular person's prosecution is irrelevant to the person's sentence itself. That is to say, even if the party changed its activities, for example, warranting reclassification, the actions for which petitioner was prosecuted are not retroactively altered or justified.

14

reclassification, as his association with FARC was not a factor in his original sentence.

IV. CONCLUSION

For the foregoing reasons, petitioner's motion for habeas relief is DENIED. The Clerk of Court is directed to terminate the motion at 11-cr-836, ECF No. 101, and to close the case 17-cv-133.

SO ORDERED.

Dated:    New York, New York
          November 27, 2017

_____
KATHERINE B. FORREST
United States District Judge

Copy to:
Yesid Rios Suarez
No. 92000-054
U.S. Penitentiary—McCreary
P.O. Box 3000
Pine Knot, KY 42635